C & W SPREADERS, L.L.C., a.k.a. CW Spreaders, L.L.C., Plaintiff–Respondent,

v.

**Daniel WOSOBA, Defendant–Appellant.**

No. SD 30204.

Missouri Court of Appeals, Southern District, Division One.

Oct. 28, 2010.

which the trial court awarded as damages for breach of contract as a result of his interference with the L.L.C.'s business relationship with a supplier, was in error because the contract at issue did not prohibit interference with a business relationship. We agree and reverse that part of the trial court's judgment.

### Factual and Procedural Background

We view the evidence in the light most favorable to the trial court's judgment. *Estate of Thompson v. Hicks*, 148 S.W.3d 32, 35 (Mo.App.2004). Furthermore, as neither party requested that the trial court make written findings of fact and conclusions of law, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c).[1] Taken in that context, the following evidence was adduced at trial.

William Cary had been a friend of Floyd Wosoba and his son, Daniel, for several years.[2] While Cary was "riding around somewhere" with Floyd, the two began discussing the use of poultry litter as fertilizer, and Floyd, a long-time farmer and fixture in the trucking industry, expressed his desire for Daniel, then eighteen years old, to get involved in the industry and have a steady income. Later on, all three men sat down to discuss setting up a business partnership between Cary and Daniel. In an attempt to assist in that planning, Floyd made multiple unreturned calls to George's of Missouri ("George's"), a poultry company located in Springdale, Arkansas. Cary, however, was eventually able to get in touch with Kendall Pendergraph—a long-time friend of Floyd's and the general manager of George's—and

J.D. Baker, Baker Law Firm, Osceola, MO, for Appellant.

Kendall R. Vickers, The Vickers Law Firm, Nevada, MO, for Respondent.

GARY W. LYNCH, Judge.

Daniel Wosoba appeals from a $20,587.45 judgment in favor of CW Spreaders, L.L.C. ("the L.L.C."). He claims that $13,987.55 of that amount,

---

1. All rule references are to Missouri Court Rules (2010).

2. Due to shared last names, for clarity we may sometimes refer to individuals by their first names. No familiarity or disrespect is intended.

Cary, Daniel, and Floyd later met with Pendergraph. Out of that meeting came an arrangement for George's to supply the new business venture with chicken litter.

Pendergraph agreed that George's would sell the L.L.C. up to six loads of chicken litter per week at a price to be set by Pendergraph. The initial price was $6.00 per ton. Later, Pendergraph raised it to $8.00 per ton. Each load contained approximately 23 tons of litter. Other businesses in the area priced their chicken litter anywhere from $18.00 to $25.00 per ton. Pendergraph was willing to sell litter so cheaply because "it was not really a business deal for him[,]" and he just wanted "a reliable source" to haul away his litter. Pendergraph refused to put the arrangement in writing but told Cary and Daniel that he would honor the arrangement for five years. The L.L.C. was not the only company hauling away George's litter.

After solidifying George's as a supplier, in August 2007 Cary and Daniel created a limited liability company they named CW Spreaders, L.L.C.[3] Cary's wife drafted the operating agreement, which specified that, for purposes of managerial decision making, Cary would have a fifty-one percent interest in the company, while Daniel would have a forty-nine percent interest; the profits, however, would be split equally.

Following its creation, the L.L.C. purchased a spreader truck and trailer to use for the business. The truck was destroyed in an accident on May 23, 2008. The insurance proceeds more than covered the remaining loan on the vehicles, and the surplus was split evenly between Cary and Daniel. After the accident, the L.L.C. arranged in the short term for other individuals to truck the litter from George's back to the L.L.C.'s base of operations but eventually began using a converted truck belonging to Daniel's father. Floyd did not want compensation for the L.L.C.'s use of the truck, but the L.L.C. paid for the truck's maintenance and fuel. The L.L.C. also rented a trailer to use for hauling.

In addition to the initial purchase of the spreader truck and trailer, the L.L.C. also purchased a loader and a bi-directional tractor, as well as another loader truck for parts, two buckets and a grapple for the tractor, and various other "odds and ends mechanical pieces."

On August 19, 2008, Daniel told Cary that he no longer wanted to be involved with the L.L.C. Daniel asked Cary to "price the physical equipment" and Daniel would decide if he wanted to sell his share to Cary or purchase Cary's share. Cary priced the L.L.C.'s equipment—a tractor, litter bed, loader truck, and GPS unit—at $10,000.00, plus the $22,000.00 owed in debt. Daniel chose to pay Cary $10,000.00, assume the $22,000.00 debt, and take possession of the L.L.C.'s equipment. Before approaching Cary about withdrawing from the business, Daniel had already purchased another spreader truck. Around that same time, Daniel purchased the trailer that the L.L.C. had been renting and using to haul litter.

In preparation for obtaining a loan to pay off the debt, Daniel asked Cary to write a letter he could give to the bank. The first document Cary prepared listed the items to be transferred and included a statement by Cary agreeing to "release [his] interest in the above items to Daniel Wosoba" for the agreed-upon price. The bank, however, found this document insuf-

---

**3.** Originally, the L.L.C. was named "C & W Spreaders, L.L.C," but the name was later changed to remove the ampersand.

ficient, and Daniel asked Cary to write a second letter and to include the serial numbers for the equipment that would be transferred to Daniel. In addition to listing each piece of equipment with its accompanying serial number and selling price, including the assumption of debt, the second letter included the following statement:

> I agree to settle all remaining accounts of customers to date and turn over all monies to C & W Spreaders LLC as per our partnership agreement. I further agree not to interfere with *C & W Spreaders LLC business* or any contracts they currently hold (verbal or in writing) or in any way act as doing business as C & W Spreaders, or C & W Spreaders LLC etc. As per our agreement I will turn over to you the remaining parts of the wet kit removed from the wrecked 1999 Mack truck.

(Emphasis added). There was no mention of any of the L.L.C.'s other assets in the letter. Daniel signed the letter on August 25, 2008, and Cary acknowledged receipt of the letter that same day.

The next day, Cary withdrew $12,000.00 from the L.L.C.'s bank account and deposited the money in his own personal bank account. Shortly thereafter, Daniel withdrew the remaining money, $3,889.44, from the L.L.C.'s account and closed the account.

Following his withdrawal from the L.L.C. on August 25, 2008, Daniel began hauling litter from George's the next week under the name "DW Farms." From that time through the time of trial, he hauled from George's on a fairly regular basis. Daniel continued to pay George's $8.00 per ton of chicken litter. George's allowed him to haul as many as fifteen loads per week. Floyd, under the name "Wosoba Trucking," also hauled litter from George's

following Daniel's withdrawal, mostly for his own personal use.

During the first week of October, Cary personally traveled to George's in Springdale to arrange a meeting with Pendergraph, explain the situation to him, pick up a load of chicken litter, and continue with the litter-hauling arrangement. When he arrived Pendergraph told him that would be the last load George's sold to the L.L.C.

Although the letter agreement was signed on August 25, 2008, consummation was not attempted until October 10, when Cary contacted the Wosobas to initiate exchange of the equipment and money at a neutral site. Cary expected Daniel to bring the $10,000.00 mentioned in the letter agreement, the money Daniel had collected from various outstanding accounts, and the wet kit for the truck. Daniel had already obtained financing for repayment of the loan. When he arrived, however, Daniel brought a copy of checks showing Cary's withdrawal of funds from the L.L.C.'s account and attempted to give Cary a check for $4,000.00; Daniel explained his belief that half of the money Cary withdrew was his and should be applied as a credit toward the $10,000.00 he owed the L.L.C. for the equipment. Cary refused Daniel's tender and asked for the full $10,000.00. When they reached an impasse, Cary attempted to leave with the equipment. Daniel and Floyd moved their vehicles and blocked Cary in, at which point Cary called the police. The responding law enforcement officers would not let Cary leave with the equipment, and everyone left without exchanging any money or property. At some point thereafter, Daniel took possession of the equipment.

Although he was unable to purchase litter from George's, Cary continued operating the L.L.C. and hauling litter, albeit on an irregular basis. From the time of Daniel's withdrawal from the L.L.C. through

the time of trial, Cary bought and sold a total of 724.31 tons of poultry litter. Cary calculated that, had he been able to purchase the litter from George's at the previously agreed-upon rate of $8.00 per ton, he would have made an additional $13,987.55 during that time period.

The L.L.C. filed suit against Daniel on November 26, 2008. In its petition, the L.L.C. set forth six counts alleging that: Daniel had taken possession of the truck, tractor, and accompanying accessories without tendering the $10,000.00 owed to the L.L.C. (Count I); Daniel "wrongfully converted to his own use" $18,964.04 from customers of the L.L.C. (Count II); Daniel wrongfully withdrew $3,889.44 from the L.L.C.'s checking account (Count III); after his withdrawal from the L.L.C., Daniel used the rental "end dump trailer" from mid-August 2008 through the end of September 2008 even though the L.L.C. had already paid rent on the trailer for that time period (Count IV); Daniel interfered with the "contract" between George's and the L.L.C. and, as a result, caused the L.L.C. to lose approximately $15,000.00 in profits (Count V); and Daniel wrongfully retained possession of the "wet kit" following his withdrawal from the L.L.C. (Count VI).

Daniel denied the allegations in his answer but at trial admitted that he owed the L.L.C. a total of $2,559.71, an amount which took into account the remaining outstanding accounts receivable, the L.L.C.'s liquid assets, and the purchase of the L.L.C.'s equipment.

Following a bench trial, the trial court entered judgment in favor of the L.L.C. and against Daniel in the amount of $20,587.45, which included $13,987.55 for the L.L.C.'s lost profits under Count V of its petition. The trial court specifically found in its judgment that "[Daniel], through his father, acting as [Daniel's] agent, did violate the terms of the August 25, 2008, letter agreement for the withdrawal of [Daniel] from the LLC, by interfering with [the L.L.C.'s] ongoing business relationship with George's of Arkansas [sic], to [the L.L.C.'s] damages [sic] in the amount of ... ($13,987.55)." This appeal timely followed.

### Standard of Review

As this was a court-tried case, we will affirm the trial court's judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Mihlfeld & Assocs., Inc. v. Bishop & Bishop, L.L.C.,* 295 S.W.3d 163, 170 (Mo.App.2009).

### Discussion

Daniel presents four points for our review; his first point, however, is dispositive. In his first point relied on, Daniel contends that

[t]he trial court erred in finding that [Daniel] materially breached an agreement with the [L.L.C] by interfering with an ongoing business relationship with George's because the trial court improperly construed the contract provisions between [Daniel] and [the L.L.C] and erroneously applied the law of contracts by giving effect to its erroneous interpretation in that the trial court construed the agreement between [Daniel] and [the L.L.C] to restrict [Daniel] from interfering with a business relationship when the agreement between [Daniel] and [the L.L.C.] restricted interference with 'contracts' only.

Daniel's argument on this point initially focuses on the L.L.C.'s contention in its petition and at trial that the arrangement between the L.L.C. and George's was a "contract," the interference with which by Daniel was prohibited by the letter agree-

ment's express prohibition as to "contracts." The L.L.C.'s abandonment of that position on appeal and its adoption of the trial court's characterization of that arrangement as a "business relationship" rather than a contract, however, has shifted the resolution of this point to Daniel's secondary argument that the phrase "C & W Spreaders LLC business," as used in the letter agreement creates an ambiguity in the letter agreement that should be construed against the L.L.C. and in his favor.

"The question of whether a contract is ambiguous and the interpretation of the contract itself are issues of law[.]" *Executive Bd. of Mo. Baptist Convention v. Carnahan,* 170 S.W.3d 437, 447 (Mo.App. 2005); *see also Royal Banks of Missouri v. Fridkin,* 819 S.W.2d 359, 361 (Mo. banc 1991). We review issues of law *de novo. Pierce v. BSC, Inc.,* 207 S.W.3d 619, 621 (Mo. banc 2006). We must thus examine, *de novo,* the withdrawal agreement to determine what, exactly, the parties agreed to with regard to Daniel's actions following his withdrawal from the L.L.C.

Interpreting a contract requires that "[t]he plain, ordinary, and usual meaning of a contract's words are used, and the whole document is considered." *Jackson County v. McClain Enters., Inc.,* 190 S.W.3d 633, 640 (Mo.App.2006). "A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable men may fairly and honestly differ in their construction of the terms." *Helterbrand v. Five Star Mobile Home Sales, Inc.,* 48 S.W.3d 649, 658 (Mo. App.2001). Any ambiguity "must appear from the four corners of the contract[;] extrinsic evidence cannot be used to create an ambiguity[,]" *Erwin v. City of Palmyra,* 119 S.W.3d 582, 585 (Mo.App.2003), and any ambiguity will be construed against the drafter of the contract.

*Triarch Indus., Inc. v. Crabtree,* 158 S.W.3d 772, 776 (Mo. banc 2005).

While alleging in its petition and arguing at trial that the L.L.C.'s arrangement with George's was a contract, the L.L.C. now abandons that position and concedes on appeal in its responding brief that it was not a contract. Thus, according to the L.L.C, the only issue before us "is whether this arrangement is 'business' of [the L.L.C.'s] that [Daniel] interfered with by doing business on his own with George's after he severed his ties with [the L.L.C.]." The relevant sentence of the letter agreement reads, "I further agree not to interfere with *C & W Spreaders LLC business* or any contracts they currently hold (verbal or in writing) or in any way act as doing business as C & W Spreaders, or C & W Spreaders LLC etc." (Emphasis added).

In order to support its findings on this issue in its judgment, the trial court implicitly concluded as a matter of law that the term "business" as used in this sentence is broad enough to include Daniel's interference with others who are in a "business relationship" with the L.L.C. The L.L.C. assumes such a meaning in its argument on this point, spending the majority of this section in its responding brief discussing why the arrangement with George's, even though not a contract, constituted a business relationship. While this is a reasonable construction of the meaning of "business" as used by the parties in their letter agreement, it is not the *only* reasonable construction.

The word "business" has a variety of meanings, two of which apply in the context of the letter agreement. On the one hand, "business" can mean "the purchase and sale of goods in an attempt to make a profit." RANDOM HOUSE DICTIONARY 283 (2d ed.1987). Such a definition includes the interaction between the L.L.C.

and others in the purchase and sale of goods and, thus, encompasses the trial court's broad interpretation as prohibiting Daniel from interfering with the business *relationships* of the L.L.C. On the other hand, however, "business" can also mean "a person, partnership, or corporation engaged in commerce, manufacturing, or a service[.]" *Id.* Thus, "business" can also more narrowly mean the L.L.C.'s engagement in commerce, which by definition includes the L.L.C.'s actions but not the actions of others who may be in a business relationship with the L.L.C. This meaning logically falls within the scope of the letter agreement as a reasonable interpretation of "business" with which Daniel was not to interfere. It does not, however, support the trial court's broad inclusion of business relationships within that prohibition.

The reasonableness of the narrower meaning of "business" is illustrated by Daniel's testimony. When asked what he believed he was promising when he signed the withdrawal letter, Daniel stated, "I was not to interfere with C & W, as far as business, and I didn't." Daniel's statement indicates that he perceived the withdrawal agreement as prohibiting his interference with the engagement of the L.L.C. in commerce, not as prohibiting his interference with any "business relationships" the L.L.C. might have had with others. Given the narrower dictionary definition of "business" supporting that view, we cannot say that Daniel's perception is an unreasonable construction of the letter agreement's reference to "C & W Spreaders LLC business."

While we are required to construe the letter agreement considering only the language actually used by the parties, it is interesting to note, and the ambiguity is highlighted by the fact that, the drafter could have differentiated between these two meanings with just a slight change in wording depending upon his intent. For instance, if the drafter intended the broader meaning he could have used the possessive so that the letter agreement read "I further agree not to interfere with C & W Spreaders LLC*'s* business[.]" Similarly, if the drafter intended the narrower meaning he could have inserted the article "the" so that it read, "I further agree not to interfere with *the* C & W Spreaders LLC business[.]"

Reading only from the four corners of the letter agreement, however, this Court finds it impossible to discern which meaning of the word "business" the parties intended to employ, as reasonable men could fairly and honestly differ in their construction of the "business" with which Daniel was not to interfere. *See Helterbrand,* 48 S.W.3d at 658. Therefore, the term "business" as used in the context of the letter agreement creates an ambiguity that must be resolved.

As stated *supra,* any ambiguity must be construed against the drafter of the contract at issue, *Triarch Industries, Inc.,* 158 S.W.3d at 776; in this case, Cary admitted that he drafted the withdrawal agreement on behalf of the L.L.C. We must therefore construe the term "business" against the L.L.C, rejecting the trial court's broad interpretation of that term and accepting the narrower meaning of "business" that does not include business relationships.

Construing the ambiguity in the letter agreement against the L.L.C. and in Daniel's favor means that even if Daniel continued to do business with George's after he withdrew from the L.L.C. or Daniel's agent contacted and urged George's to discontinue selling to the L.L.C., such actions were not prohibited by the letter agreement and, thus, did not constitute a breach of contract. Daniel's first point is granted.

### Decision

That part of the trial court's judgment against Daniel awarding the L.L.C. damages in the amount of $13,987.55 for lost profits under Count V of the L.L.C.'s petition is reversed. In all other respects, the trial court's judgment is affirmed.

BARNEY, P.J., and BURRELL, J., concur.